# United States Court of Appeals

*for the*

# Fifth Circuit

Case No.  25-10879

TODD TARGGART, MOHAMMED LIMON, STEVEN MARTINEZ,

*Lead Plaintiffs-Appellants*,

– v. –

NEXT BRIDGE HYDROCARBONS, INC., ROBERT L.  COOK,
CLIFTON DUBOSE, JR., JOSEPH DEWOODY, LUCAS T.  HAWKINS,
DELVINA OELKERS, MIA PITTS, KRISTIN WHITLEY, GREGORY
MCCABE, JOHN BRDA,

*Defendants-Appellees*,

On Appeal from the United States District Court for the
Northern District of Texas, Fort Worth in Case No.  4:24-cv-00767-P
Honorable Mark Timothy Pittman, U.S. District Court

## BRIEF FOR LEAD PLAINTIFFS-APPELLANTS

SHAYNE D. MOSES
DAVID A. PALMER
MOSES, PALMER & HOWELL, L.L.P.
Fort Worth Club Building
306 West 7th Street, Suite 504
Fort Worth, TX 76102
Telephone: 817/255-9101
817/255-9199 (fax)

ADAM M. APTON
LEVI & KORSINSKY, LLP
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone:  212/363-7500
212/363-7171 (fax)

*Counsel for Lead Plaintiffs-Appellants*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.    All persons or entities that acquired shares of Next Bridge Hydrocarbons, Inc. in connection with its spin-off from Meta Materials, Inc. on December 14, 2022, including Lead Plaintiffs-Appellants Todd Targgart, Mohammed Limon, Steven Martinez;

2.    Defendant Next Bridge Hydrocarbons, Inc.;

3.    Defendant Robert L. Cook;

4.    Defendant Clifton Dubose, Jr.;

5.    Defendant Joseph DeWoody;

6.    Defendant Lucas T. Hawkins;

7.    Defendant Delvina Oelkers;

8.    Defendant Mia Pitts;

9.    Defendant Kristin Whitley;

10.    Defendant Gregory McCabe;

11.    Defendant John Brda;

12.    Levi & Korsinsky, LLP, counsel for Lead Plaintiffs-Appellants;

- i -

13.    Moses, Palmer & Howell, L.L.P., counsel for Lead Plaintiffs-Appellants;

14.    DLA Piper LLP (US), counsel for Defendant John Brda;

15.    Wick Phillips Gould Martin LLP, counsel for Defendants Next Bridge Hydrocarbons, Inc., Robert L. Cook, Clifton Dubose, Jr., Joseph DeWoody, Lucas T. Hawkins, Delvina Oelkers, Mia Pitts, Kristin Whitley, and Gregory McCabe; and

16.    O'Melveny & Meyers LLP, counsel for Defendants Next Bridge Hydrocarbons, Inc., Robert L. Cook, Clifton Dubose, Jr., Joseph DeWoody, Lucas T. Hawkins, Delvina Oelkers, Mia Pitts, Kristin Whitley, and Gregory McCabe.

/s/ Adam M. Apton
Adam M. Apton
*Counsel for Lead Plaintiffs-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request oral argument pursuant to Rule 34 of the Federal Rules of Appellate Procedure and Fifth Circuit Rule 28.2.3.  Appellants believe oral argument will significantly aid the decision process and is in order in light of the gravity of the legal issues involved and the potential impact of this case on securities law because of the issues presented by this appeal.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS .................................................................i

STATEMENT REGARDING ORAL ARGUMENT .............................................. iii

JURISDICTION.........................................................................................................1

ISSUES PRESENTED...............................................................................................2

I.    STATEMENT OF THE CASE ........................................................................3

    A.    Introduction ...........................................................................................3

    B.    Statement of Facts .................................................................................6

        1.    Next Bridge's Spin-Off.................................................................6

        2.    The O&G Assets. ..........................................................................7

        3.    The Registration Statement...........................................................8

        4.    Damages.......................................................................................10

        5.    John Brda. ...................................................................................11

        6.    The SEC's Enforcement Action...................................................12

II.   SUMMARY OF ARGUMENT.......................................................................15

III.  STANDARD OF REVIEW ............................................................................20

IV.   ARGUMENT..................................................................................................20

    A.    The District Court Should Not Have Dismissed Appellants'
        Section 11 Claims for Failing to Plead "Statutory Coverage."...........20

    B.    The District Court Also Committed Reversible Error When
        Dismissing Appellants' Section 12(a)(2) Claims...............................29

**Page**

C.     Having Adequately Alleged Primary Violations under Sections 11 and 12(a)(2), Appellants' Control-Person Claims under Section 15 Should Be Reinstated. .......................................................32

V.     CONCLUSION..................................................................................32

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*7547 Corp. v. Parker & Parsley Dev. Partners, LP*,
38 F.3d 211 (5th Cir. 1994) ...................................................... 20, 22, 24

*Dasho v. Susquehanna Corp.*,
461 F.2d 11 (7th Cir. 1972) ......................................................23

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976)......................................................16

*Freedman v. Value Health, Inc.*,
190 F.R.D. 33 (D. Conn. 1999) ......................................................25

*Garland v. Cargill*,
602 U.S. 406 (2024)......................................................28

*Herman & Maclean v. Huddleston*,
459 U.S. 375 (1983)...................................................... 3, 16

*Hildes v. Arthur Andersen LLP*,
734 F.3d 854 (9th Cir. 2013) ......................................................24

*Isquith v. Caremark Int'l*,
136 F.3d 531 (7th Cir. 1998) ...................................................... 29, 30

*Mader v. Armel*,
402 F.2d 158 (6th Cir. 1968) ......................................................23

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Entm't Corp.*,
58 F.4th 195 (5th Cir. 2023) ...................................................... 20, 32

*In re Old Banc One Shareholders Securities Litigation*,
No. 00 C 2100, 2004 U.S. Dist. LEXIS 7563 (N.D. Ill. Apr. 29,
2004) ...................................................... 25, 26

**Page**

*S.E.C. v. National Securities, Inc.*,
   393 U.S. 453 (1969)..................................................................................23

*SEC v. Datronics Eng'rs, Inc.*,
   490 F.2d 250 (4th Cir. 1973) ............................................................ 23, 32

*SEC v. National Student Marketing Corp.*,
   457 F. Supp. 682 (D.D.C. 1978).............................................................25

*Sheldon v. Vermonty*,
   No. 99-3202, 2000 U.S. App. LEXIS 27292 (10th Cir. Oct. 30,
   2000) ......................................................................................................31

*Smallwood v. Pearl Brewing Co.*,
   489 F.2d 579 (5th Cir. 1974) ...................................................................23

*Tidelands Marine Serv. v. Patterson*,
   719 F.2d 126 (5th Cir. 1983) ...................................................................28

*United States v. Wernes*,
   157 F.2d 797 (7th Cir.1946) ....................................................................22

**STATUTES**

15 U.S.C. § 77b..........................................................................................22

15 U.S.C. § 77k..................................................................................... 2, 21

15 U.S.C. § 77l............................................................................................2

15 U.S.C. § 77v............................................................................................1

28 U.S.C. § 1291 .........................................................................................1

28 U.S.C. § 1331 .........................................................................................1

**Page**

**OTHER AUTHORITIES**

5A Charles Alan Wright & Arthur R. Miller, Federal Practice and
Procedure § 1357 (2d ed. 1990)......................................................................31


**REGULATIONS**

17 C.F.R. § 230.145 ................................................................................. 23, 25

**JURISDICTION**

Lead Plaintiffs-Appellants Todd Targgart, Mohammed Limon, and Steven Martinez ("Appellants") appeal a judgment dismissing their securities class action claims with prejudice. Appellants alleged violations of the Securities Act of 1933. The United States District Court for the Northern District of Texas had jurisdiction over the case pursuant to 15 U.S.C. § 77v and 28 U.S.C. § 1331.

On July 3, 2025, the district court granted Defendants' motions and dismissed Plaintiffs' case with prejudice. The Clerk of the Court entered judgment against Plaintiffs later that day. ROA.2346-58.

On July 29, 2025, Plaintiffs timely filed their Notice of Appeal. ROA.2359-60.

This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

These issues are reviewed *de novo*:

1.    If a shareholder exchanges his shares in an old company to acquire shares in a new one, can he sue for damages under Section 11 of the Securities Act of 1933 (15 U.S.C. § 77k) when it later turns out that the new company's registration statement contained materially false financial statements?

2.    Should a defendant who fraudulently solicits the purchase of a security be allowed to escape liability under Section 12(a)(2) of the Securities Act of 1933 (15 U.S.C. § 77l(a)(2)) because the plaintiff acquired his shares through a share-for-share exchange?

3.    Did the district court err in dismissing Appellants' Section 15 claims against the directors and officers who controlled Next Bridge Hydrocarbons, Inc. ("Next Bridge")?

## I.   STATEMENT OF THE CASE

### A.   Introduction

Plaintiffs seek to hold Next Bridge and its controlling officers and directors liable for filing a false and misleading registration statement with the U.S. Securities and Exchange Commission.  The registration statement registered shares to complete a spin-off of oil and gas assets that, according to Next Bridge's balance sheet, were worth $47,293,607 as of September 30, 2022 (the "O&G Assets").  In truth, the O&G Assets were worth $0.  Thus, investors who exchanged their shares in Next Bridge's parent company, Meta Materials, Inc. ("Meta Materials"), for shares in the new spin-off entity, *i.e.*, Next Bridge, received shares that were worth materially less than they initially believed.  By statute, these investors should have been able to recover their damages against Next Bridge and its directors and officers; indeed, where a registration statement contains false statements, "[l]iability against [Defendants] is virtually absolute."  *Herman & Maclean v. Huddleston*, 459 U.S. 375, 381-82 (1983).

The structure of the spin-off transaction is the most complicated aspect of this case.  At its simplest, Meta Materials was Next Bridge's parent company.  It came into existence after a merger between Torchlight Energy Resources, Inc. ("Torchlight"), a publicly traded oil and gas company operating primarily in the Orogrande Basin in West Texas, and Metamaterial Technologies Inc.

- 3 -

("Metamaterial"), a Canadian technology company that claimed to specialize in high-performance functional materials and nanocomposites. Once the merger was complete, the surviving entity changed its name to Meta Materials and created Next Bridge as a subsidiary to take control of Torchlight's legacy oil and gas assets, *i.e.*, the O&G Assets. The transaction at issue in this case is the spin-off of the O&G Assets from Meta Materials into Next Bridge as an independent operating company.

Torchlight's CEO at the time, Defendant John Brda, hyped the spin-off in the months leading up to it. He used investor presentations and social media posts to promote the O&G Assets and push the narrative that the oil reserves associated with the O&G Assets were in the billions of barrels. His promotion caused an inordinate number of retail individual traders (many of whom qualified as "meme traders") to purchase shares of preferred stock in Meta Materials that could then be tendered in exchange for shares in Next Bridge upon the completion of the spin-off. These preferred shares traded over-the-counter under the ticker "MMTLP" at an average price of around $8/share.

When the time for the spin-off finally came, shareholders of Meta Materials' preferred stock exchanged their preferred shares to receive the newly registered shares in Next Bridge. The spin-off closed with a purported value exceeding $47 million; however, in actuality, Next Bridge's value was nothing close to that because the O&G Assets were worthless. Appellants presented three series of factual

allegations showing that the O&G Assets were at all relevant times worthless. These allegations were:

- Next Bridge's restatement of its financial statements. Despite claiming in its registration statement that the O&G Assets had a value of $47,293,607 as of September 30, 2022, Next Bridge ultimately reported (after a restatement) that as of December 31, 2022, the O&G Assets had a value of $0;

- Next Bridge's former parent company, Meta Materials, had loaned money to Next Bridge using the O&G Assets as collateral. Immediately after the spin-off, Meta Materials wrote down the loan to $0 because, as it told investors, the value of the O&G Assets was "not substantive"; and

- Historical records with University Lands and internal correspondence by/between Torchlight and the Texas Railroad Commission confirmed that the O&G Assets had produced only "[s]kim of oil (not a barrel & none sold) & very little gas" and were a "nightmare to drill."

Individually and collectively, these facts demonstrated that the O&G Assets listed in Next Bridge's registration statement were never worth $47 million. To the contrary, they established the O&G Assets were worthless and that Defendants knew they were of no value. Despite this, the district court failed to address these facts in

- 5 -

its analysis. Instead, it decided the case on what amounted to procedural grounds; namely, that Appellants did not have statutory standing to sue. Respectfully, this conclusion was wrong, and the district court's decision should be reversed so the case can proceed on the merits.

## B.    Statement of Facts

### 1.    Next Bridge's Spin-Off

As explained above, Next Bridge finds its genesis in Torchlight, a publicly traded oil and gas company that operated primarily in the Orogrande Basin in West Texas. ROA.383 (¶2); ROA.388-89 (¶26). On June 28, 2021, Torchlight merged with a Canadian technology company named Metamaterial. ROA.383-84 (¶3); ROA.390 (¶32). Pursuant to the terms of the merger, Torchlight's shareholders received preferred shares of stock through a special dividend that entitled them to an interest in the proceeds of Torchlight's oil and gas assets if/when they were sold by the combined company, Meta Materials. ROA.383-84 (¶3); ROA.389-390 (¶¶29-32). Meta Materials ultimately did not sell the O&G Assets but instead spun them off into Next Bridge. ROA.384 (¶4); ROA.390 (¶33). Consequently, Meta Materials' preferred stockholders tendered their shares in exchange for shares in Next Bridge instead of receiving proceeds from the sale of the O&G Assets. ROA.384 (¶5).

### 2.    The O&G Assets.

The O&G Assets consisted primarily of oil and gas leases in the Orogrande Basin in Hudspeth County, Texas (the "Orogrande Assets"). ROA.394 (¶48).[1] The importance of the Orogrande Assets first emerged in 2019 when Torchlight claimed they comprised an estimated 3.7 billion barrels of oil. ROA.394-95 (¶49). Torchlight reiterated this claim over the following years, telling investors that it was focused on developing the Orogrande Assets in order to exploit an estimated "3.7 billion barrels" of recoverable oil and between "5 and 8 Tcf of gas." ROA.396-97 (¶¶50-52) (excerpts of investor presentations and tweets authored by Defendant Brda).

Meta Materials issued the preferred shares for the O&G Assets in June 2021. ROA.383-84 (¶3); ROA.390 (¶32). In October 2021, the shares started trading on over-the-counter markets under the ticker symbol "MMTLP". ROA.391 (¶34). Investors understood that the MMTLP shares represented interests in Torchlight's O&G Assets. ROA.391 (¶34). Defendant Brda, who was Torchlight's CEO prior to the merger (ROA.388 at ¶25), told shareholders that they could invest in the O&G Assets by purchasing MMTLP shares because they were "basically the same thing"

---

[1] The O&G Assets also included: minor interests in the Eastern edge of the Midland Basin in West Texas (the "Hazel Assets"); and two minor well interests in Oklahoma (the "Oklahoma Assets"). ROA.392 (¶38). The Hazel Assets and Oklahoma Assets are not at issue in this case; there is no dispute that at all relevant times they were non-producing and/or did not generate any revenue for Next Bridge, and false statements about their value were not made. ROA.393-94 (¶¶42-47).

(ROA.391 at ¶34).  The MMTLP shares traded publicly from October 2021 through December 2022.  ROA.391 (¶34).

### 3.    The Registration Statement.

On July 14, 2022, while the preferred shares were trading publicly, Next Bridge filed a registration statement on Form S-1.  ROA.384 (¶4).  On November 18, 2022, the SEC declared the registration statement "effective."  ROA.384 (¶4). Unbeknownst to shareholders at the time, the registration statement contained the following false and/or materially misleading statements.

The registration statement represented that the O&G Assets were worth in excess of $47 million as of September 30, 2022 (ROA.407 at ¶81).  The O&G Assets were not worth in excess of $47 million. To the contrary, they had little to no value. Appellants rely on three facts to support this contention.  *First*, in its 2023 annual report, Next Bridge restated the value of the O&G Assets to zero ($0).  ROA.398 (¶56).  Companies restate financial statements to correct material errors, thereby confirming that Next Bridge's financial statements were false when made. ROA.398-99 (¶¶57-58).  *Second*, Meta Materials likewise impaired the value of the O&G Assets in its 2022 annual report immediately following the spin-off. ROA.400-01 (¶¶62-65).  *Third*, the O&G Assets have always been worthless; the Orogrande Assets have never demonstrated any capacity to produce oil or gas, and nothing suggests the assets could be economically developed.  The Orogrande Assets

comprising the O&G Assets were located miles away from the nearest gas pipeline, had been abandoned by previous owners and co-developers, and did not produce hydrocarbons at a profitable rate. ROA.402-05 (¶¶66-76). According to internal emails, the best well in the Orogrande Assets had been shut-in because it produced only a "[s]kim of oil (not a barrel & none sold) & very little gas." ROA.405-06 (¶77). The other wells produced only "fresh water" and, at that, "were a nightmare to drill," according to Defendant McCabe. ROA.406 (¶78). Furthermore, records with the Texas Railroad Commission show zero oil and zero natural gas production. ROA.406 (¶79).

The registration statement represented that its financial statements fairly presented, in all material respects, Next Bridge's financial position and had been checked by a qualified audit committee (ROA.407-09 at ¶¶83-85). Next Bridge's financial statements did not fairly present its financial position. ROA.410 (¶86). Instead, the registration statement misstated the value of the O&G Assets on Next Bridge's financial statements, claiming they were worth in excess of $47 million when in fact they were worth $0. Furthermore, the registration statement contained a lengthy recitation of the roles and responsibilities belonging to Next Bridge's Audit Committee, including its responsibility for the review of Next Bridge's financial statements to ensure their accuracy, and management's participation in presenting Next Bridge's financial position. These descriptions of Next Bridge's internal

processes falsely portrayed the accuracy of its financial statements and audit controls.  ROA.410 (¶86).

In violation of Regulation S-K, the registration statement concealed Defendant McCabe's financial interest in an agreement that diverted oil and gas revenue away from Next Bridge (the "Option Agreement") (ROA.410-13 at ¶¶89-94).  Item 404 of Regulation S-K required Next Bridge to disclose certain information about related-party transactions.  ROA.410 (¶88).  Next Bridge disclosed the Option Agreement but omitted Defendant McCabe's full financial interest in it.  Specifically, the Option Agreement required Next Bridge to give all revenue generated from the Hazel Assets to a third-party entity named Masterson Hazel Partners, L.P.  ROA.410-11 (¶¶89, 90).  Absent from the registration statement's description of this agreement was the fact that McCabe held a material interest in Masterson Hazel Partners, L.P.  Likewise, the registration statement did not disclose the amount of money McCabe was receiving under it.  ROA.411-13 (¶¶91-94).

### 4.    Damages.

On December 14, 2022, Meta Materials completed the spin-off of the O&G Assets into Next Bridge.  ROA.384 (¶5); ROA.392 (¶35).  Appellants tendered their Meta Materials preferred stock in exchange for shares in Next Bridge believing that they owned an interest in oil and gas assets worth over $47 million based on the

representations that had been made. This was false. The O&G Assets were actually worth $0. Consequently, the preferred stockholders who received Next Bridge shares in the spin-off ultimately received shares in a company that was worth substantially less—actually nothing—than what was represented in the registration statement. This difference in value establishes Appellants' damages, which can be measured in several different ways, including but not limited to the change in book value on Next Bridge's balance sheet and/or the difference between what Appellants paid for the shares (either before the merger or while trading over-the-counter under the "MMTLP" ticker symbol) and present market value. *Compare* ROA.398 (¶56) (showing $79.7 million decrease in book value at time of restatement) *with* ROA.392 (¶¶36-37) (identifying MMTLP stock sales made by Defendants McCabe and Brda prior to spin-off at prices between $2.90/share and $11.65/share).

### 5. John Brda.

Defendant Brda is central to this case. He served as CEO of Next Bridge's predecessor parent company, Torchlight, from 2014 through its merger with Metamaterial. ROA.388 (¶25). While at Torchlight, Brda was one of only four employees. ROA.388 (¶25).

Brda was directly involved in Torchlight's merger negotiations with Metamaterial. ROA.389 (¶¶27-28). Alongside Torchlight's founder and controller, Defendant McCabe, Brda held virtual meetings with Metamaterial's management

and, as the SEC's enforcement action later revealed, was responsible for the special dividend, preferred shares, and spin-off underlying this lawsuit. *See* ROA.389-390 (¶¶28-29); ROA.417-419 (¶¶122-27); ROA.423 (¶140).

More so than any other individual defendant in this lawsuit, Brda promoted Next Bridge and touted the money investors could make if they bought in prior to the spin-off. *See* ROA.391 (¶34). Brda repeatedly used social media (mainly Twitter) to promote Next Bridge and solicit shareholders. *See, e.g.,* ROA.391 (¶34); ROA.417 (¶¶120-21); ROA.419-20 (¶128); ROA.421 (¶133).

### 6.    The SEC's Enforcement Action.

On July 20, 2023, approximately seven months after the spin-off, Meta Materials filed a Form 8-k disclosing that the SEC had issued a "Wells Notice" to Brda and others. ROA.1505.

On June 25, 2024, the SEC filed suit accusing Brda of committing securities fraud under Section 10(b) and Rule 10b-5. While Brda's public support for the O&G Assets, preferred shares, and the spin-off had been publicly known up to this point, the SEC's complaint placed Brda's actions in context. It revealed Brda's integral role in a "fraudulent scheme" aimed at creating a "short squeeze" that, importantly, required him to solicit retail shareholders to invest in the O&G Assets to pull it off. The SEC's enforcement action has a different focus than the case at bar; specifically, it focuses on statements made by Brda about his supposed efforts to sell the O&G

Assets (and not the value of the O&G Assets themselves). However, the factual information contained in the SEC's complaint undisputedly establishes Brda's role as a "statutory seller" for purposes of Section 12(a)(2) liability. ROA.417 (¶120). Specifically, the SEC's complaint revealed that:

- In or around June 2020, Brda concocted a scheme to combat short-sellers of Torchlight's stock, which as he described in internal correspondence would result in forcing "short" investors to "cover" their positions, *i.e.*, a "short squeeze." ROA.417 (¶121);

- Brda's plan entailed segregating Torchlight's O&G Assets, creating a new class of preferred stock tied to the O&G Assets, marketing and promoting the preferred stock using a "short squeeze" narrative, and ultimately enriching himself once the "short squeeze" was executed. ROA.417-19 (¶¶122-26);

- Brda then followed through with his plan by securing approval from Metamaterial's board of directors to "[p]lay up the [preferred share] dividend," according to a September 2020 presentation. ROA.419 (¶127);

- Brda recruited third-party consultants to help promote Torchlight's merger and the preferred shares that would be issued for the O&G

- 13 -

Assets paying them between $3,000 and $5,000 per month.  ROA.419-20 (¶128);

- Brda meanwhile developed the plans for the spin-off and launched Next Bridge by, *inter alia*, obtaining Defendant McCabe's approval for the spin-off given his then-current role as Chairman and recruiting management to oversee Next Bridge by paying them "consulting fees" in the amount of $20,000 per month.  ROA.420-21 (¶¶129-30); and

- Simultaneously, Brda was continuing to promote Torchlight's O&G Assets and the preferred shares that would ultimately turn into Next Bridge through the spin-off.  This included arming stock promoters with information about his "short squeeze" plan that they could use to solicit retail investors, and he could use to hold meetings with institutional investors wherein he discussed his plans for the preferred stock and the "short squeeze" it would create, and personally post promotional claims about Torchlight's O&G Assets on Twitter.  ROA.420-22 (¶¶130-35).

The SEC's complaint also made clear that Brda profited from his plans for the spin-off and "short squeeze."  As a result of Brda's promotional campaign, Torchlight's trading volume surged just prior to and after the record date for the preferred stock dividend.  ROA.419-22 (¶¶126-37).  Brda used this period of peak

volume (indeed, trading reached over 80 million shares per day hitting prices upwards of $10 per share) to hold an at-the-market offering for Torchlight. ROA.422-23 (¶¶137-39). In total, the offering sold 16.2 million shares and raised $137.5 million. ROA.423 (¶139). On June 24, 2021, immediately following the offering and just one day before the merger closed with Metamaterial, Brda successfully obtained a $1.5 million bonus based on the success of the capital raise he had conducted. ROA.423-24 (¶¶141-43).

In August 2021, Brda then submitted his fully formed plan for the spin-off of the O&G Assets to Meta Materials' board of directors, including specifics as to the management team (which had been receiving payment since January 2021). ROA.423 (¶140). The plan was adopted and completed the following year with the spin-off occurring in December 2022. In the interim, Brda promoted the preferred stock and Next Bridge's spin-off repeatedly (while also selling hundreds of thousands of shares for millions of dollars in proceeds). *See*, *e.g.*, ROA.392 (¶37); ROA.424-28 (¶¶144-51).

## II.   SUMMARY OF ARGUMENT

This case presents a striking violation of the Securities Act of 1933. Congress enacted the Securities Act to "provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to

promote ethical standards of honesty and fair dealing." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976). Thus, whenever a registration statement contains a false or materially untrue statement, "[l]iability against the issuer of [the] security is virtually absolute." *Herman & Maclean*, 459 U.S. at 381-82. Here, Next Bridge misrepresented the value of its O&G Assets. Why then did the district court dismiss Appellants' case at the pleading stage?

The district court dismissed Appellants' case because it misconstrued the structure of the spin-off which led to the faulty conclusion that Appellants did not have "statutory coverage" to pursue their claims under the Securities Act. Critically, the district court mistakenly thought that Appellants "receive[d] securities as a distribution without giving any other value in exchange" and, therefore, did not satisfy the "damages provision" in Section 11 of the Securities Act that "assumes a plaintiff has 'paid' an 'amount' for the security." ROA.2352-53. In actuality, the spin-off terms clearly provided:

- At the time of the spin-off, Meta Materials will distribute Next Bridge's newly registered stock on a pro rata basis to Meta Materials' preferred stockholders;

- Each share of Meta Materials' preferred stock will entitle the holder thereof to receive one share of Next Bridge stock;

- Preferred stockholders will not be required to pay any consideration for the Next Bridge stock but instead, ***immediately after the spin-off, all shares of Meta Materials preferred stock Meta will be cancelled***;

- Preferred stockholders could decide ***not*** to receive Next Bridge shares by "***sell[ing] shares of Series A Preferred Stock on or before the Record Date***"; and

- For U.S. federal income tax purposes, "***the Spin-Off will not be eligible for treatment as a tax-deferred distribution***" but instead as a "fully taxable transaction" because it qualified as a "***sale***" that "***result[ed] in a 'complete termination' of a U.S. holder's interest***" in Meta Materials.

ROA.641; ROA.673; ROA.675-77.   Consequently, investors who wanted to participate in Next Bridge's spin-off had to acquire shares of Meta Materials' preferred stock and then exchange those shares for Next Bridge shares.  Investors were ***not*** able to receive Next Bridge shares while also retaining their preferred stock in Meta Materials; they had to relinquish their preferred stock in exchange for the Next Bridge stock.

Appellants' respective transaction histories help illustrate this point. Messrs. Limon, Targgart, and Martinez acquired their Next Bridge shares through different means:

Mohammed Limon. Mr. Limon was a longtime shareholder in Torchlight, acquiring his shares long before its merger with Metamaterial. As part of the merger, Mr. Limon along with all other legacy Torchlight shareholders received shares of preferred stock in the combined company, Meta Materials. These preferred shares were at all relevant times intended to compensate legacy Torchlight shareholders for the O&G Assets that Meta Materials ended up controlling through the merger. Mr. Limon held his preferred stock up to and through the spin-off, thereby ultimately exchanging his preferred stock for 30,000 newly registered Next Bridge shares. ROA.128-29; ROA.386 (¶13).

Todd Targgart. Mr. Targgart was also a longtime legacy Torchlight shareholder. Like Mr. Limon, Mr. Targgart bought Torchlight shares, received 10,000 shares of Meta Materials preferred stock in the merger, and held them through the spin-off to receive Next Bridge stock. However, ***Mr. Targgart also purchased 6,500 additional shares of Meta Materials preferred stock prior to the spin-off while it was trading over-the-counter under the "MMTLP" ticker***. Mr. Targgart bought these additional "MMTLP" shares at prices ranging from $2.95/share to $10.26/share. He then tendered his entire 16,500 shares of Meta

Materials preferred stock in exchange for his new shares in Next Bridge in the spin-off. ROA.431; ROA.386 (¶12).

Steven Martinez.  Unlike Messrs. Limon and Targgart, Mr. Martinez did not own any legacy Torchlight stock and did not receive any preferred shares in Meta Materials from the merger.  Instead, Mr. Martinez purchased 100% of his 19,108 "MMTLP" shares while it was trading over-the-counter.  He purchased these shares at prices ranging from $1.11/share to $12.09/share, and then traded them in to receive his Next Bridge shares.  ROA.432-33; ROA.386 (¶14).

Thus, Appellants each gave something of value in exchange for their Next Bridge stock in the spin-off: Mr. Limon tendered his Meta Materials preferred stock in exchange for the Next Bridge shares; Mr. Targgart likewise tendered his Meta Materials preferred stock, which consisted of the shares he received initially from the Torchlight/Metamaterial merger and subsequently the "MMTLP" shares he purchased over-the-counter; and Mr. Martinez exchanged the "MMTLP" shares he acquired over-the-counter to receive his Next Bridge shares.

Had the district court properly accounted for these facts, it would not have concluded that "the statute simply does not apply" to Appellants.  ROA.2353.  Instead, it would have correctly determined that Appellants "acquired" their Next Bridge stock for "value" and were therefore qualified to pursue their Securities Act

claims as plaintiffs ordinarily are in the context of a stock-for-stock merger. *See 7547 Corp. v. Parker & Parsley Dev. Partners, LP*, 38 F.3d 211, 223 (5th Cir. 1994).

## III.   STANDARD OF REVIEW

This Court reviews "*de novo*" the dismissal of a complaint under Rule 12(b)(6), accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff. *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Entm't Corp.*, 58 F.4th 195, 206 (5th Cir. 2023).

## IV.   ARGUMENT

### A.    The District Court Should Not Have Dismissed Appellants' Section 11 Claims for Failing to Plead "Statutory Coverage."

The district court issued a narrow opinion. It did not consider the merits of the Section 11 claims, *i.e.*, that Next Bridge told investors the O&G Assets were worth over $47 million when in truth they were worth $0. Instead, it looked at one issue and then decided that issue against Appellants when dismissing their entire case. That issue was whether Appellants' purchase history qualified them to pursue claims under Section 11 of the Securities Act. Respectfully, the district court decided this issue incorrectly.

Section 11 of the Securities Act states: "In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, ***any person acquiring such***

- 20 -

*security* (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue . . . ."  15 U.S.C. § 77k(a) (emphasis added).  The district court interpreted the "acquiring" language as requiring potential plaintiffs to give something of "value in exchange" for the shares they receive.  ROA.2352-53.  The district court held incorrectly that Appellants failed to meet this requirement.

As explained above, Appellants each acquired their Next Bridge shares through different means: Mr. Limon received Meta Materials preferred stock during the initial Torchlight/Metamaterial merger, held those shares, and then ultimately tendered them in exchange for Next Bridge stock in the spin-off (ROA.386 at ¶13); Mr. Targgart likewise received Meta Materials preferred stock in the initial merger but also purchased additional preferred stock while it was trading over-the-counter, and then tendered everything in exchange for Next Bridge stock in the spin-off (ROA.386 at ¶12); and Mr. Martinez purchased the entirety of his preferred stock while it was trading over-the-counter before exchanging it for Next Bridge stock in the spin-off (ROA.386 at ¶14).  ***Importantly, no one received Next Bridge stock without exchanging their preferred shares***.  ROA.641 (" . . . immediately after the Spin-Off, all shares of Series A Non-Voting Preferred Stock of Meta shall be cancelled.").  Each Appellant gave something of value when he "acquired" his shares.

These facts fall in line with the stock-for-stock exchanges described in *7547 Corp. v. Parker & Parsley Development Partners, LP, supra*. In that case, this Court reversed the lower court's decision on summary judgment, holding that the plaintiffs' "exchange[]" of "units for stock" constituted a sale for the purposes of stating a claim under Section 11. 38 F.3d at 224-25. This Court also rejected the defendants' arguments on injury and causation. Although the defendants argued that the plaintiffs "actually profited" from the transaction, the Court noted it would be "hesitant to conclude that there has been no injury—or merely speculative injury— to the plaintiffs" based on the allegations in the complaint. *Id*. at 225 & n.17.

The question "turn[s] to the definition of 'sale' under the Securities Act, which provides that '[t]he term 'sale' or 'sell' shall include every contract of sale or disposition of a security or interest in a security, for value.'" *Id.* at 223 (quoting 15 U.S.C. § 77b(3)). "This section is generally interpreted to include exchanges of one security for another." *Id.* (citing *United States v. Wernes*, 157 F.2d 797, 799 (7th Cir. 1946)). *See also Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 591 (5th Cir. 1974) ("all Pearl shares were converted into shares of Southdown preferred under the merger agreement. Smallwood and the other members of his class, therefore, effectively 'sold' their shares of Pearl and 'purchased' shares of Southdown on that day"); *SEC v. Datronics Eng'rs, Inc.*, 490 F.2d 250, 253 (4th Cir. 1973) ("As the term 'sale' includes a 'disposition of a security', the dissemination of the new stock

- 22 -

among Datronics' stockholders was a sale.  However, the appellees urged, and the district court held, that this disposition was not a statutory sale because it was not 'for value', as demanded by the definition.  Here, again, we find error."); *Dasho v. Susquehanna Corp.*, 461 F.2d 11, 24 (7th Cir. 1972) ("there is no doubt that Susquehanna's acquisition of its own shares in exchange for its block of Vanadium stock was a 'purchase' within the meaning of the Rule"); *Mader v. Armel*, 402 F.2d 158, 160 (6th Cir. 1968) (finding a "sale" occurred "when the merger was approved and the exchange of securities occurred, the owner of stock had in effect purchased a new security and paid for it by turning in his old one.  In such a situation the antifraud protections afforded by the Securities Act are needed no less than in a situation where one makes an outright purchase of stock for cash.").  Indeed, in *S.E.C. v. National Securities, Inc.*, 393 U.S. 453 (1969), the Supreme Court concluded that the shareholders of a merged corporation had "'purchased' shares in the new company by exchanging them for their old stock." *Id.* at 467.

SEC Rule 145, which abandoned the no-sale rule, further demonstrates that certain exchanges of securities—*e.g.*, in connection with mergers, consolidations, and transfers of assets—are covered within the registration provisions of the Securities Act as constituting "sales."  *See* 17 C.F.R. § 230.145(a)(3)(ii) (defining an "offer, offer to sell, offer for sale, or sale" as, *inter alia*, a "transfer of assets of such corporation or other person, to another person in consideration of the issuance

of securities of such other person or any of its affiliates"). "These factors confirm that the [spin-off] transaction constituted a 'sale' of securities for regulatory purposes of the Securities Act. It would be inconsistent to find that the exchange of [stock] for stock in a newly-formed corporation is a 'sale' for certain purposes of the Securities Act but not a 'sale' for purposes of the private civil remedy to enforce those provisions." *7547 Corp.*, 38 F.3d at 223-24.

The law is replete with cases that support Appellants' position on this issue. For example, the Ninth Circuit's decision in *Hildes v. Arthur Andersen LLP*, 734 F.3d 854 (9th Cir. 2013), addressed a plaintiff seeking leave to assert a Section 11 claim to recover losses from a stock-for-stock merger. The Ninth Circuit reversed the lower court's decision because the defendants failed to carry their "heavy burden" on the affirmative defense of "negative causation." *Id.* at 860-61. Although the plaintiff owned his shares before the registration statement for the merger was published, he could have "avoided the exchange of shares" had the "accounting irregularities" not been concealed. *Id.* at 861-62. Likewise, Appellants were not "obliged to obtain [Next Bridge] stock at the time the Registration Statement was filed" but instead could have sold the shares prior to the spin-off's completion while it was trading over-the-counter under the "MMTLP" ticker, or in the case of Mr. Martinez, could have avoided buying the stock altogether. *Id.* at 862-63 (citing *SEC v. National Student Marketing Corp.*, 457 F. Supp. 682 (D.D.C. 1978)). Importantly,

- 24 -

Appellants' exchange of their Meta Materials preferred stock for Next Bridge shares in the spin-off constituted a "sale" under the Securities Act. *See* 17 C.F.R. § 230.145 ("transfer of assets" subject to Securities Act per Rule 145).

Similarly, in *Freedman v. Value Health, Inc.*, 190 F.R.D. 33 (D. Conn. 1999), the court granted class certification to plaintiffs who acquired shares of stock in a stock-for-stock merger. The plaintiffs consisted of investors who purchased shares of stock on the open market as well as those who received shares in exchange for the shares they already owned. In construing Section 11's damages provisions, the court held that plaintiffs who exchanged their shares in the merger would be "entitled to a measure of damages that relies on the market price . . . of their Diagnostek stock at the time that they exchanged it for shares of Value Health." *Id*. at 35-36. In *In re Old Banc One Shareholders Securities Litigation*, No. 00 C 2100, 2004 U.S. Dist. LEXIS 7563 (N.D. Ill. Apr. 29, 2004), the court allowed the plaintiffs to pursue claims on behalf of shareholders who received shares in the merged company through a stock-for-stock exchange. Significantly, the court held that shareholders who purchased shares in the pre-merger company *after* the misleading registration statement was issued, but *before* the exchange occurred, could pursue claims against the defendants because they "suffered an actual loss of the type meant to be protected under [the Securities Act]." *Id*. at *19-20.

Section 11 of the Securities Act most certainly covers potential plaintiffs who acquire newly registered shares in a spin-off, as the foregoing cases demonstrate. The district court, however, distinguished these cases under the mistaken belief that Appellants received their Next Bridge shares **without** giving something for value in exchange. In pertinent part, the district court wrote:

> In contrast, the Act's definition of "sale" does not cover the transaction that caused Plaintiffs to own shares of Next Bridge. Although Plaintiffs refer in their response to their "exchange of 'MMTLP' shares for [Next Bridge] stock in the spin-off" (ECF No. 56 at 9), their live pleading says, to the contrary, that Meta II "completed the Spin-Off and distributed [Next Bridge]'s equity to the Preferred Stock shareholders as of December 12, 2022[.]" In other words, Plaintiffs did not give value for their Next Bridge shares. Instead, they paid money for shares of Torchlight or Meta II and later became entitled to a distribution—not a purchase—of Next Bridge shares.

ROA.2352. The district court supported its description of the transaction by referring to Next Bridge's registration statement—**but incompletely so**. When characterizing the transaction as a "distribution" instead of an "exchange," the district court wrote: "In fact, the Registration Statement says so plainly: 'We [Next Bridge] are . . . not asking you [Preferred Shareholders] to make any payment or surrender or exchange any of your shares of Meta [II] common stock for shares of our Common Stock.'" ROA.2352 (quoting ROA.543) (omitting footnote concerning court's ability to take judicial notice of registration statement).

At the same time though, the registration statement confirmed that "immediately after the Spin-Off, all shares of Series A Non-Voting Preferred Stock

of Meta shall be cancelled" (ROA.512) and that "[i]f you sell any of your shares of Series A Preferred Stock on or before the Distribution Date, you will not receive any shares of Common Stock" (ROA.543). Next Bridge's final prospectus (which comprised the final registration statement that ultimately went "effective" at the time of the spin-off) contained the same descriptions once again confirming that:

- Preferred stockholders would be exchanging their shares for Next Bridge common stock because "immediately after the Spin-Off, all shares of Series A Non-Voting Preferred Stock of Meta shall be cancelled" (ROA.641); and

- Preferred stockholders were told they could decide not to exchange their shares for Next Bridge because "[i]f you sell shares of Series A Preferred Stock on or before the Record Date, you will not be entitled to receive the shares of Common Stock in the Distribution in respect of such shares of Series A Preferred Stock sold. We expect all trading of the shares of Series A Preferred Stock to be suspended as of the Distribution Date" (ROA.673).

Next Bridge's disclosure about the "tax classification" of the spin-off further supports the conclusion that the spin-off transaction resulted in a "sale or exchange" (and not a "distribution"). In pertinent part, the final prospectus stated that for U.S. federal income tax purposes, "the Spin-Off will not be eligible for treatment as a tax-

deferred distribution" but instead as a "fully taxable transaction" because it qualified as a "sale" under the "complete termination" test. This test, as described by Next Bridge, stated that: "The Spin-Off generally will be treated as a sale of Series A Preferred Stock (rather than as a corporate distribution) if the Spin-Off: (i) results in a 'complete termination' of a U.S. holder's interest in Meta . . . . There will be a complete termination of a U.S. holder's interest if either (i) all of the shares of Meta stock actually and constructively owned by such U.S. holder are exchanged . . . ." ROA.675-77.

The district court concluded that, "[i]n short, the most analogous cases available indicate a Section 11 plaintiff must have given value for the securities issued under the contested registration statement." ROA.2352. That was precisely what happened. Appellants tendered their Meta Materials preferred shares in exchange for Next Bridge stock. By overlooking this important fact, the district court erred and committed reversible error by dismissing Appellants' case.[2]

---

[2] Regardless of what one may want to call Appellants' transactions, it involved a "sale" under the statute as each paid significant consideration. As Justices Sotomayor, Kagan, and Jackson wrote in their recent dissent in *Garland v. Cargill*, "When I see a bird that walks like a duck, swims like a duck, and quacks like a duck, I call that bird a duck." 602 U.S. 406, 430 (2024). *See also Tidelands Marine Serv. v. Patterson*, 719 F.2d 126, 128 n.3 (5th Cir. 1983) ("That which looks like a duck, walks like a duck, and quacks like a duck will be treated as a duck even though some would insist upon calling it a chicken.").

**B.    The District Court Also Committed Reversible Error When Dismissing Appellants' Section 12(a)(2) Claims.**

The district court held that "Plaintiffs' Section 12 claim suffer[ed] from the same fatal flaw as their Section 11 claim." ROA.2354. The district court described this "flaw" as the absence of a "purchase." ROA.2354-55. However, as explained above, Appellants' acquisition of Next Bridge stock constituted a "purchase" because they gave value in exchange for the shares, *i.e.*, they tendered their Meta Materials preferred stock in exchange for Next Bridge's newly registered shares. *See* Section IV.A., *supra*.

The district court relied incorrectly on *Isquith v. Caremark International*, 136 F.3d 531, 534 (7th Cir. 1998), to support its holding. That case is easily distinguishable. In it, the plaintiffs attempted to sue for false statements in a registration statement used in a spin-off. While the term "spin-off" is present in both this case and *Isquith*, the specifics of the transactions are very different. Here, Appellants tendered their preferred stock in Meta Materials in exchange for newly registered shares in Next Bridge; in *Isquith*, the plaintiffs merely received additional shares in the spin-off entity without giving up anything. The Seventh Circuit emphasized this point, as follows:

> The distinction is critical in this case. In a squeeze-out, stock is exchanged for cash; the person squeezed out no longer has any interest in the corporation; that is unquestionably a change in his bundle of property rights. In a spinoff there is no exchange, no forced exit from the corporation, but merely the receipt by the corporation's

shareholders of additional stock. ***Only the form in which the members of the class owned Baxter's assets was changed; it was changed from stock in one corporation to stock in two corporations. After the change the class members owned the same proportion, carrying the same rights, of the same pool of assets. Before, their ownership interest was denominated in shares of Baxter; after, in shares of Baxter and Caremark***; the interest itself--the amount of assets owned by the members of the class-was unchanged.

*Id.* at 536 (emphasis added). Thus, aside from using the term "spin-off" in the decision, *Isquith* is not like the case at bar and should not have been determinative in the district court's analysis. Appellants had no choice but to give up their Meta Materials preferred stock in exchange for newly registered shares in Next Bridge; they did not possess the same property rights after the spin-off. *See* ROA.641; ROA.673.

The district court identified what it incorrectly perceived as a second flaw with Appellants' Section 12 claim, which it described as the "flip-side of the same coin: Just as the alleged 'purchase' was not in fact a purchase, neither did Brda's alleged 'sale' of Next Bridge stock actually pertain to Next Bridge stock at all." ROA.2356. But the facts alleged show that Brda was most certainly soliciting the sale of Next Bridge stock while its registration statement was pending. While Meta Materials' preferred stock was trading over-the-counter under the "MMTLP" ticker, Brda promoted Next Bridge repeatedly using aggressive social media posts intended to pique interest among retail individual traders (particularly, "meme traders"). *See, e.g.*, ROA.424-28 (¶¶144-51). This conduct (which the district court referred to as

- 30 -

"Plaintiffs' post-merger pleadings") is more than enough to trigger liability under Section 12(a)(2).

The district court's only basis for disagreeing with Appellants on this point appears to be that Next Bridge's stock was not trading at the time, thereby meaning that Brda could not have been actively soliciting "sales" of Next Bridge stock. *See* ROA.2356. That conclusion is unsupported by the facts and should not control the outcome. Brda's solicitations make explicit reference to Next Bridge—referring to it either as "Oilco" or "NBH". *See, e.g.*, ROA.424 (¶144); ROA.425 (¶145); ROA.427 (¶149); ROA.428 (¶151). All the while, Brda knew that the O&G Assets were materially misstated in Next Bridge's registration statement and, as the SEC's complaint makes clear, he orchestrated the spin-off for personally motivated financial reasons. *See* Section I.B.6., *supra*. Considering the realities of the scenario that unfolded, dismissal was not the correct course of action in this case. *See* 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, at 341-43 (2d ed. 1990) ("court should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or extreme, since it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions"). *See also Sheldon v. Vermonty*, No. 99-3202, 2000 U.S. App. LEXIS 27292, at *11-12 (10th Cir. Oct. 30, 2000) ("We conclude that plaintiff's §12(a)(2) allegations concerning the merger between Power Phone (a

- 31 -

public company alleged to be a shell having little or no assets) and TMC Agroworld are sufficient to survive defendants' motion to dismiss.  Accordingly, the district court's dismissal of the claim was premature."); *Datronics Eng'rs, Inc.*, 490 F.2d at 253 ("sale" included "dissemination of the new stock among Datronics' stockholders").

### C. Having Adequately Alleged Primary Violations under Sections 11 and 12(a)(2), Appellants' Control-Person Claims under Section 15 Should Be Reinstated.

The district court dismissed Appellants' control liability claims under Section 15 because it found no primary liability under Sections 11 or 12(a)(2).  Thus, because the district court erred in rejecting primary liability, its rejection of control liability was also error.  *See Six Flags Entm't Corp.*, 58 F.4th at 221 (reversing "judgment regarding control person liability" after reversing holding on primary liability).

### V. CONCLUSION

Based on the foregoing, the district court's dismissal of Appellants' complaint should be reversed.

*[Signature blocks on following page]*

DATED: September 30, 2025         Respectfully submitted,

LEVI & KORSINSKY, LLP

s/ Adam M. Apton
ADAM M. APTON

Adam M. Apton
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: 212/363-7500
212/363-7171 (fax)

MOSES, PALMER & HOWELL, L.L.P.

s/ Shayne D. Moses
SHAYNE D. MOSES

Shayne D. Moses
State Bar No. 14578980
David A. Palmer
State Bar No. 00794416
306 West 7th Street, Suite 504
Fort Worth, TX 76102
817/255-9100
817/255-9199 (fax)

*Counsel for Lead Plaintiffs-Appellants*

**CERTIFICATE OF SERVICE**

I, hereby certify that on September 30, 2025, a true and correct copy of the foregoing was filed with the Clerk of the Court for the Fifth Circuit Court of Appeals by using the appellate CM/ECF.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Notice will be electronically mailed to:

Colin Patrick Benton, colin.benton@wickphillips.com

Kristin Cope, kcope@omm.com

David J. Drez, III, david.drez@wickphillips.com

Paul T. Elkins, paul.elkins@wickphillips.com

Jason Hopkins, jason.hopkins@dlapiper.com

Ryan Lantry, ryan.lantry@us.dlapiper.com

Jason Scott Lewis, Jason.lewis@us.dlapiper.com

Shayne Daniel Moses, smoses@mph-law.com

LaDawn H.  Nandrasy, ladawn.nandrasy@wickphillips.com

David A. Palmer, dpalmer@mph-law.com

Abby Rudzin, arudzin@omm.com

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 30, 2025, in New York, New York.

s/ Adam M. Apton
ADAM M. APTON

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel certifies that Lead Plaintiffs-Appellants' Brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), the document contains 7,049 words according to the word count provided by Microsoft Word for Microsoft 365 (Version 2508) word-processing software. The document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 because it uses a proportionally spaced Times New Roman typeface with 14-point font and 12-point font footnotes.



s/ Adam M. Apton
ADAM M. APTON