# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 26, 2026

Lyle W. Cayce
Clerk

No. 25-10879

_____

Todd Targgart,

*Plaintiff—Appellant*,

*versus*

Next Bridge Hydrocarbons, Incorporated; George Palikaras; Robert L. Cook; Clifton Dubose, Jr.; Joseph DeWoody; Lucas T. Hawkins; Delvina Oelkers; Mia Pitts; Kristin Whitley; Gregory McCabe; John Brda,

*Defendants—Appellees*.

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:24-CV-767

_____

Before Stewart, Engelhardt, and Douglas, *Circuit Judges*.

Per Curiam:[*]

Todd Targgart and other Next Bridge Hydrocarbons shareholders bring this securities-fraud suit against Defendants for filing an allegedly inaccurate Registration Statement with the SEC in connection with Next Bridge's spinoff from its parent company, Meta Materials. The district court

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 25-10879

dismissed Plaintiffs' claims after concluding that they failed to allege that they purchased their Next Bridge interests for value, as required by the securities law. But the district court omitted from its analysis the fact that Plaintiffs were dispossessed of their equity in Meta Materials when they received their Next Bridge shares. Because our precedent deems this stock-for-stock exchange a purchase, we REVERSE.

I.

Next Bridge is an oil and gas company that was incorporated in 2021, but it traces its roots back to Torchlight Energy Resources, Inc., a publicly traded company that operated oil and gas interests in West Texas. In June 2021, Torchlight merged with Metamaterial Technologies Inc., together becoming Meta Materials Inc. The parties structured the merger so that "all of the value" of Torchlight's oil and gas assets ("O&G Assets") would go to "legacy Torchlight stockholders." To accomplish this, the parties agreed that Meta Materials would distribute a "special dividend" of non-voting Preferred Stock to Torchlight's stockholders entitling them to the proceeds from any sale of the O&G Assets.[1] The parties also agreed that, if Meta Materials did not sell the O&G Assets, it would spin them off and distribute the equity in any newly formed entity to the Preferred Stockholders.

Meta Materials ultimately did not sell the O&G Assets, so it spun them off into Next Bridge.[2] Consistent with the merger plan, Meta Materials distributed Next Bridge common stock to the Preferred Stockholders when the spinoff was completed in December 2022. At the same time, it canceled

---

[1] Meta Materials Preferred Stock was traded on over-the-counter markets under the ticker "MMTLP."

[2] Before the spinoff, the O&G Assets were owned by OilCo Holdings, Inc., a Meta Materials subsidiary. OilCo became Next Bridge in the spinoff.

their Preferred Stock, leaving the investors with interests only in Next Bridge.

As part of the spin-off process, Next Bridge filed a Registration Statement with the SEC, in which it valued the O&G Assets at $47,293,607 as of September 30, 2022. A few months after the spinoff, Next Bridge filed its fiscal report for 2022, in which it listed under its "[c]urrent assets" "[o]il and natural gas properties, net," valued at $79,695,928 as of December 31, 2022. In the following year's report, however, Next Bridge restated its 2022 report to reflect that its O&G Assets had been worth nothing.

Plaintiffs are Next Bridge shareholders who allege that Next Bridge and several affiliated individuals violated Sections 11, 12, and 15 of the Securities Act of 1933 by filing an inaccurate Registration Statement with the SEC and by promoting investment in Next Bridge. The district court dismissed each of Plaintiffs' claims pursuant to Rule 12(b)(6), concluding that Plaintiffs did not purchase or otherwise acquire for value their Next Bridge securities—as required by the statute—because they received their Next Bridge interests merely as a distribution, giving nothing in return. Plaintiffs appeal.

## II.

"We review orders on Rule 12(b)(6) motions to dismiss for failure to state a claim under the *de novo* standard of review. In doing so, we must accept all facts in the complaint as true, but do not accept conclusory allegations, unwarranted factual inferences, or legal conclusions." *McKay v. LaCroix*, 117 F.4th 741, 746 (5th Cir. 2024) (citation omitted). "In considering a motion to dismiss, we may . . . consider documents that a defendant attaches to a motion to dismiss if they are referred to in the plaintiff's complaint and are central to her claim." *Sligh v. City of Conroe*, 87 F.4th 290, 297 (5th Cir. 2023) (per curiam) (citation modified).

III.

The district court's decision was narrow, turning primarily on whether Plaintiffs had statutory standing to bring their Securities Act claims. "Unlike Article III standing, statutory standing is not jurisdictional. Instead, it asks the merits question of whether or not a particular cause of action authorizes an injured plaintiff to sue." *Simmons v. UBS Fin. Servs., Inc.*, 972 F.3d 664, 666 (5th Cir. 2020) (citation modified). "A claimant has statutory standing if its claim falls within the zone of interests protected by the statute." *Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.*, 80 F.4th 607, 616 (5th Cir. 2023) (citation modified).

We address Plaintiffs' claims under Sections 11, 12, and 15 of the Securities Act in turn.

A.

Section 11 "imposes strict liability on issuing companies when their registration statements contain material misstatements or misleading omissions." *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 762 (2023) (citing 15 U.S.C. § 77k). Relief under Section 11 is available to "'any person acquiring' a security issued pursuant to a defective registration statement," which we have defined to mean "purchasers of shares issued and sold pursuant to the challenged registration statement." *7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 223 (5th Cir. 1994) (quoting 15 U.S.C. § 77k(a)). To be a purchaser, a party must have acquired his security "for value," such as by "exchang[ing] . . . one security for another." *Id.* (quoting 15 U.S.C. § 77b(3)).

The district court dismissed this claim, holding that Plaintiffs alleged only that they were "distributed" Next Bridge shares in the spinoff—not that they purchased them for value. This distribution, the court found, did not require Plaintiffs to give up their equity in Meta Materials, meaning that they

held both their Preferred Stock and Next Bridge stock after the spinoff. The court noted that the Registration Statement itself explained that Next Bridge was "not asking [Preferred Stockholders] to make any payment or surrender or exchange" their Meta Materials equity. ROA.543.

But this assessment does not accurately reflect the transaction here. Instead, as the Registration Statement makes clear,[3] all Preferred Stock was canceled once the Next Bridge stock was distributed, and the Preferred Stockholders "cease[d] to have any rights with respect to such shares." ROA.673; *see also* ROA.641 ("[I]mmediately after the Spin-Off, all shares of Series A Non-Voting Preferred Stock of Meta shall be cancelled."). These were not isolated transactions. Plaintiffs' receipt of Next Bridge stock was plainly conditioned on ownership—and forfeiture—of Preferred Stock. Indeed, the Registration Statement warned investors that if they sold their Preferred Stock prior to the spinoff, they "w[ould] not be entitled to receive the shares of Common Stock in the Distribution in respect of such shares of . . . Preferred Stock sold." ROA.673.

So, contrary to the district court's conclusion, Plaintiffs did surrender their interests in Meta Materials when they received their Next Bridge stock. The operative complaint does not describe this transaction in detail, alleging only that Plaintiffs "received" Next Bridge stock "distributed" by Meta Materials pursuant to the spinoff and wholly failing to expressly mention that they forfeited their Preferred Stock in return. But we know from other allegations in the Amended Complaint that the Preferred Stock corresponded to the O&G Assets, of which Meta Materials divested itself in the spinoff. Since the Preferred Stock was tethered to the O&G Assets, which

---

[3] We can consider the Registration Statement because Defendants attached it to their motion to dismiss, Plaintiffs refer to it in their complaint, and it is central to their claims. *Sligh*, 87 F.4th at 297.

Meta Materials no longer owned after the spinoff, we can reasonably infer that Plaintiffs did not retain any ownership in Meta Materials after the spinoff. *See McLin v. Ard*, 866 F.3d 682, 688 (5th Cir. 2017) ("In reviewing the complaint, we draw all inferences in favor of the nonmoving party, and view all facts and inferences in the light most favorable to the nonmoving party." (citation modified)). And, as explained above, the Registration Statement confirms that Plaintiffs were dispossessed of their Preferred Stock concurrent with their receipt of Next Bridge stock.

This transaction resembles the exchange in *7547 Corp.*, where the plaintiffs "relinquished their partnership interests" in one company pursuant to a merger but received shares of the new company in return. 38 F.3d at 214–15. We held that this "trade [of] units for stock" constituted a purchase under the Securities Act. *Id.* at 224–25. Like the plaintiffs in *7547 Corp.*, Plaintiffs here gave up one security—Preferred Stock—for another—Next Bridge stock. As in *7547 Corp.*, this exchange of securities satisfies Section 11.

Defendants nonetheless argue that Plaintiffs did not give any value for their interests because both the Preferred Stock and the Next Bridge stock corresponded to the same O&G Assets. They contend that when a transaction results in merely a technical change to an investor's interests, the fundamental-change doctrine precludes deeming the transaction a purchase, citing *Rathborne v. Rathborne*, 683 F.2d 914 (5th Cir. 1982), and *Isquith ex rel. Isquith v. Caremark Int'l, Inc.*, 136 F.3d 531 (7th Cir. 1998).

But *Rathborne* and *Isquith* are unhelpful for a couple reasons. For starters, they are factually inapposite. The plaintiffs in those cases received additional stock without having to surrender anything in return. *Rathborne*, 683 F.2d at 920 ("Prior to the 1978 reorganization, Prescott Rathborne held a one-eighth interest in RLC. When the transactional dust had settled, he

found himself with a one-eighth interest in RLC and a one-eighth interest in the new-born RPI."); *Isquith*, 136 F.3d at 534 ("[The plaintiffs] simply received one share of Caremark stock for every four shares they owned of Baxter."). In contrast, Plaintiffs here were entirely dispossessed of their Meta Materials Preferred Stock.

They are also legally inapposite because they do not adopt the fundamental-change doctrine in the Securities Act context. Rather, *Isquith* entirely "reject[ed] . . . the fundamental-change doctrine," *SEC v. Jakubowski*, 150 F.3d 675, 680 (7th Cir. 1998), and *Rathborne* applied it only to claims brought under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, 683 F.2d at 916. Defendants cite no case from our court applying the doctrine to the Securities Act, and our precedent strongly suggests—if not requires—that we decline to extend it beyond the Exchange Act. *See 7547 Corp.*, 38 F.3d at 222–29 (applying the fundamental-change doctrine only to the plaintiffs' Exchange Act claims despite also addressing Securities Act claims); *see also Katz v. Gerardi*, 655 F.3d 1212, 1222 (10th Cir. 2011) (noting that the fact that this court in *7547 Corp.* applied the doctrine "*only* to the 1934 Act claims, even though 1933 Act claims were also at issue," "undermines" the position that it applies to Securities Act claims). This accords with other courts' understandings of the fundamental-change doctrine. *See Katz*, 655 F.3d at 1222 ("From our review of the case law, courts only apply the fundamental change doctrine in relation to the 1934 Act's anti-fraud provisions (i.e. § 10(b) and Rule 10b–5) . . . ."). *But see Knapp v. Barclays PLC*, 171 F.4th 166, 170–72 (2d Cir. 2026) (per curiam).[4] We will not disturb that approach here.

---

[4] In *Knapp*, the Second Circuit applied the fundamental-change doctrine to a Securities Act case concerning a reverse stock split, where investors were forced to combine "four [debt] notes into one larger note" "worth the same amount." 171 F.4th at

No. 25-10879

In short, *7547 Corp.* controls, and it requires only that Plaintiffs show that they purchased their new interests for value. 38 F.3d at 223. Because the stock-for-stock exchange here satisfies that requirement, we reverse.

B.

Plaintiffs also allege that Next Bridge and former Torchlight CEO John Brda violated Section 12 of the Securities Act by encouraging investment in Next Bridge. "Under Section 12, any person who 'offers or sells a security,' with a prospectus or oral communication 'which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make such statements, in the light of the circumstances under which they were made, not misleading,' is liable to the person 'purchasing such security from him.'" *Lampkin v. UBS Fin. Servs., Inc.*, 925 F.3d 727, 733 (5th Cir. 2019) (quoting 15 U.S.C. § 77l(a)(2)). This includes any individual who "successfully solicits the purchase" of the relevant security when he is "motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter v. Dahl*, 486 U.S. 622, 647 (1988). "[S]tanding to sue under the private right of action afforded by this section is based upon the requirement that the plaintiff be a 'purchaser' of the security at issue. The same definition of 'sale'. . . applies to section 12 claims." *7547 Corp.*, 38 F.3d at 225.

As with the Section 11 claim, the district court concluded that Plaintiffs failed to allege that they purchased their Next Bridge shares, and

---

171–72. This transaction is clearly distinguishable from the one here, where investors traded their preferred stock in one public company for common stock—which could not be publicly traded—in a different company. We do not address whether stock splits and other similar transactions constitute purchases under the Securities Act.

therefore it held they lacked statutory standing under Section 12. For the reasons explained above, we reverse.

The court also concluded that Brda could not be held liable under Section 12 as a statutory seller of Next Bridge securities because, based on Plaintiffs' allegations, his statements pertained to Torchlight and Meta Materials, not Next Bridge. We disagree.

Plaintiffs allege that, prior to the spinoff, Brda promoted Meta Materials Preferred Stock, which he said was "basically the same thing" as OilCo (i.e., Next Bridge) securities. ROA.424. For example, just days before the spinoff, Brda posted that "MMTLP/NBH [Next Bridge] shareholders . . . ALL hold together 3.2 Billion Barrels of Oil that the world desperately needs and 500 million shares of NBH authorized that the shorts desperately need." ROA.428. These posts, along with other allegations in the complaint, plausibly bring Brda's conduct within Section 12's scope because they at least intimate that investors should acquire interests in Next Bridge.[5] *See Pinter*, 486 U.S. at 644 (explaining that "statutory seller status [includes] at least some persons who urged the buyer to purchase"). At the motion-to-dismiss stage, plausibility is all that is needed, so we reverse. *Calogero v. Shows, Cali & Walsh, L.L.P.*, 970 F.3d 576, 580 (5th Cir. 2020) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (citation modified)).

## C.

Plaintiffs further allege that the individual Defendants are liable under Section 15 of the Securities Act because of their control over Next Bridge. *See* 15 U.S.C. § 77o. "The question of controlling person liability under

---

[5] Plaintiffs also allege that Brda acted for personal gain.

No. 25-10879

Section 15 of the 1933 Securities Act is derivative of liability under Sections 11 and 12[(a)](2) and must abide that ultimate resolution." *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 370 n.33 (5th Cir. 2001).

Because we reverse as to Plaintiffs' claims under Sections 11 and 12, we also reverse as to their Section 15 claim.

IV.

In sum, we hold that Plaintiffs' allegations are sufficient to survive dismissal on the grounds addressed in the district court's order. Defendants raise several alternative arguments in favor of dismissal that were not addressed by the district court, but, "as a well-established general rule, this court will not reach the merits of an issue not considered by the district court." *Students for Fair Admissions, Inc. v. Univ. of Tex. at Aus.*, 142 F.4th 819, 828 (5th Cir. 2025) (citation modified); *see also Humphries v. Elliott Co.*, 760 F.3d 414, 418 (5th Cir. 2014) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below." (citation modified)). Because this "court is one of review, not first view," *Students for Fair Admissions*, 142 F.4th at 828 (citation modified), we leave the alternative grounds Defendants raise for the district court to consider in the first instance.

REVERSED and REMANDED.

10